**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**WESTERN DIVISION**

| | | |
|---|---|---|
| Theresa M. Bacon, | : | Case No. 1:11 CV 1805 |
| Plaintiff, | : | |
| vs. | : | |
| Commissioner of Social | : | **MAGISTRATE'S REPORT** |
| Security, | | **AND RECOMMENDATION** |
| | : | |
| Defendant. | : | |

## I. INTRODUCTION

Plaintiff seeks judicial review, pursuant to 42 U.S.C. § 405(g), of Defendant's final determination denying her claim for disability insurance benefits (DIB) filed pursuant to Title II of the Social Security Act (Act), 42 U. S. C. §§ 416 (i) and 423.  Pending are the parties' briefs on the merits (Docket Nos. 16 & 19).  For the reasons that follow, the Magistrate recommends that the Court affirm the Commissioner's decision.

## II. PROCEDURAL BACKGROUND

On February 23, 2007, Plaintiff filed a request for DIB for the reasons that she became unable to work because of her disabling condition on December 31, 1999 (Docket No. 10, pp. 176-178 of 819).  Her request was denied initially and upon reconsideration (Docket No. 10, pp. 148-150, 152-154, 156-

158, 160-162 of 819).  Plaintiff, represented by counsel and a Vocational Expert (VE), Bruce Holderead,

appeared and testified before an Administrative Law Judge (ALJ) Cheryl M. Rini on May 6, 2010.

Plaintiff, represented by counsel of record, and VE Nancy Borgeson appeared at a supplemental hearing

conducted by ALJ Rini on August 8, 2010 (Docket No. 10, p. 31 of 819).  ALJ Rini issued an

unfavorable decision on August 20, 2010 (Docket No. 10, pp. 15-24 of 819).  The Appeals Council

denied review on June 23, 2011; therefore, the ALJ's decision became the final decision of the agency

(Docket No. 10, pp. 12-14 of 819).  Plaintiff filed a timely action in this Court seeking judicial review

of the Commissioner's determination.

### III.  FACTUAL BACKGROUND.

**1.      PLAINTIFF'S TESTIMONY**
     **A.      MAY 6, 2010 HEARING**
.

At the time of hearing, Plaintiff was 47 years old.  She had completed vocational classes during

high school in cosmetology.  After graduation from high school, Plaintiff pursued advanced study in

bookkeeping (Docket No. 10, pp. 103-104 of 819).

Plaintiff explained that during 1993 and 1994, she worked for Air Conditioning Enterprises in

the capacity of dispatcher, scheduler and typist.  This was sedentary employment during which she

collected the accounts receivables from the service technicians and performed general office work.

Occasionally, she lifted up to twenty-five pounds or walked to adjourning office or to the file cabinet

(Docket No. 10, pp. 105-106 of 819).  With the onset of a migraine, Plaintiff would turn off the overhead

light, put on her sunglasses, turn the telephones over to the service and regurgitate, if necessary, in the

waste basket.  She was permitted to leave the work environment and go home when she completed

making the day's schedules (Docket No. 10, pp. 129-131 of 819).

2

From 1998 through 1999, Plaintiff worked at Staples. Promoted from a part-time worker to department manager, Plaintiff made book bindings, copies and business cards. After being absent from work for several days because of migraine headaches, Plaintiff was replaced at Staples and she was not offered another position (Docket No. 10, pp. 106-107, 124 of 819).

Plaintiff was employed at Denny's Restaurant in 2003 as a part-time hostess. She worked at K-Mart® in 2004 (Docket No. 10, pp. 108-109 of 819).

In 2005, Plaintiff was employed at Bob Evans Restaurant. Plaintiff left Bob Evans for better hours and wages at Red Lobster. There, Plaintiff spent up to 35 hours weekly as a server. Unable to cope with the demands of this job, Red Lobster personnel reassigned her to other jobs within the restaurant. Overall, Plaintiff "failed miserably" at this job and because of the stress and anxiety, her psychiatrist provided an excuse for indefinite leave (Docket No. 10, pp. 109-111, 112 of 819).

In 2006, Plaintiff was employed at Bacon Road Food Mart for approximately six months. In addition to her duties as a cashier, Plaintiff sliced meats, assisted with the sale in the hot food section and cleaned the floors. Plaintiff alternated between standing and walking while performing her duties, typically standing up to 40 minutes before she had to sit down or walk round (Docket No. 10, pp. 113-114 of 819). Also, in 2006, Plaintiff was employed by McDonalds® as a cashier and order taker. In addition, Plaintiff retrieved product from the freezer and restocked the freezer. Plaintiff was discharged when she could neither maintain the pace nor cope with the job stressors (Docket No. 10, pp. 115-116 of 819).

Because of the unpredictable nature of hormonal migraines which could be triggered by fluorescent lighting, the reflection and shining of glass and/or aromas, Plaintiff was temporarily employed at Dillard's Department Store. She recounted that once while working a migraine was

triggered and she was incapacitated to the extent that she was incapable of driving (Docket No. 10, pp. 108, 116 of 819).      In addition to migraine headaches, Plaintiff has been diagnosed with and treated for symptoms associated with carpal tunnel syndrome, a herniated disc, insomnia, fibromyalgia, hypertension and anxiety.  She consumed these medicines for the following symptoms:

    (1)    Ambien for a sleep disorder;
    (2)    Soma for fibromyalgia;
    (3)    Vicodin or Tylenol #3 for pain;
    (4)    Imitrex and Stadol, a nose spray, for migraine headaches; and
    (5)    Compazine for nausea

(Docket No. 10, pp. 108, 115, 116, 119, 122 of 819).

**B.  AUGUST 8, 2010 HEARING.**

At the time of the supplemental hearing, Plaintiff was 48 years of age.  She gave considerable detail about her employment history, characterizing herself as a "jack of all trades."  Plaintiff explained that she had significantly limited earnings in 1986 and 1987.  From 1984 until 1988, she was employed at Adams Air Conditioning and Heating.  In 1988, she earned $2,000 (Docket No. 10, p. 41 of 819).  At Home Comfort Heating and Cooling, Plaintiff performed work as a bookkeeper, dispatcher and payroll clerk (Docket No. 10, pp. 43-45 of 819).  Plaintiff was seated in this position except when she moved supplies (Docket No. 10, p. 46 of 819).

Plaintiff earned $4,642 while employed at Bob Evans Restaurant in 1989. When she started working, she was a hostess.  Plaintiff was promoted to a server, a capacity in which she worked for approximately eight months.  Neither job was performed on a full-time basis (Docket No. 10, pp. 46-48 of 819).

In 1989 and 1990, Plaintiff earned $303 and $1742, respectively, from employment at Route 21 Restaurant (Docket No. 10, p. 47 of 819).

4

In 1991, Plaintiff was employed at Air Conditioning Enterprises.  There, she dispatched the work to the technicians, completed payroll, scheduled the jobs and managed the accounts.  She was primarily a one-person administrative office which meant that she had to lift boxes of paper, make copies, file, answer telephones and deal with the flow of people through the business.  Plaintiff guesstimated that she stood for approximately two hours daily.  As the business expanded, Plaintiff became inundated with expanded duties.  Then she began to have migraine headaches at least twice weekly.  Because of the headaches, Plaintiff took leave from work three to four times weekly.  Her judgment and ability to perform the physical requirements of work were adversely affected.  In fact, her pay raise was withheld because of such poor work performance.  To avoid being fired, Plaintiff quit (Docket No. 10, pp. 48-53, 60, 66, 67 of 819).

In 1999, Plaintiff was employed at the Staples Superstore as a business manager.  She lifted individual reams of paper, printed and copied documents.  She stood for two hours in an eight-hour workday.  Plaintiff was absent for three days because of a severe migraine and upon returning to work, she did not have a job (Docket No. 10, pp. 71-74 of 819).

Plaintiff reiterated that her impairments include migraines headaches, fibromyalgia, a sleep disorder, depression, neck and back problems (Docket No. 10, pp. 61, 62, 63 of 819).  The migraines were uncontrolled with medication so her physician administered injections of medication designed to treat migraines and its symptoms.  The migraines increased in severity to the extent that Plaintiff was undergoing injections twice daily until her body no longer reacted to the introduction of the drug (Docket No. 10, pp. 53-55 of 819).  Since December 1999, Plaintiff has been unable to work because of too many headaches.  In fact, she estimated that she "missed work because of migraine headaches" two to four times monthly (Docket No. 10, pp. 55, 69 of 819).

5

The symptoms associated with fibromyalgia affected her muscles and extremities to the extent that there were times when she could not move because of aching pain.  She was prescribed a series of pain medications and a muscle relaxer to treat these symptoms.  The added benefit that the pain medication provided was treatment of the migraine headaches.  The amount of times she missed work because of the symptoms varied (Docket No. 10, pp. 62-63 of 819).

Plaintiff had herniated disc in the cervical spine.  The effects of the disc caused pinched nerve pain in her left arm (Docket No. 10, pp. 64-65 of 819).

Plaintiff also had chronic neck pain which interfered with her ability to lift, scrub, mop, stand or bend her head down (Docket No. 10, p. 66 of 819).

There were days that Plaintiff was so overwhelmed that she could not go to work or deal with customers or otherwise function (Docket No. 10, p. 67 of 819).

Plaintiff reiterated that she was prescribed Ambien for the sleep disorder.  The side effect of the Ambien was grogginess.

Between 1999 and 2001, Plaintiff was prescribed Celexa, an antidepressant.  The medication was effective (Docket No. 10, pp. 63-64 of 819).

2.      **THE VE'S TESTIMONY**.
        A.      **MAY 6, 2010 HEARING**.

Acknowledging that her testimony would be consistent with the DICTIONARY OF OCCUPATIONAL TITLES (DOT) and its companion publication, the SELECTED CHARACTERISTICS OF OCCUPATIONS (SCO), VE Holderead explained that Plaintiff had acquired skills from her jobs as an administrative clerk, cashier checker and dispatcher that would be transferrable to other semiskilled sedentary jobs, that would require a specific time for the typical worker to learn the techniques and that would be available in the numbers

as follows:

1. In Northeast Ohio, Ohio and the national economy, there were 300, 1,000 and 30,000, respectively, **Credit Card Clerk** jobs described at DOT 209.587-014, which required vocational preparation that exceeded one month and may have extended up to and including three months.

2. In Northeast Ohio, Ohio and the national economy, there were 600, 2,000 and 70,000, respectively, **Sorter** jobs, described at DOT 209.687-022, which required vocational preparation that exceeded one month and may have extended up to and including three months.

3. In Northeast Ohio, Ohio and the national economy, there were 900, 3,200 and 84,000, respectively, **Service Clerk** jobs, described in DOT 221.367-070, which required vocational preparation that exceeded three months and may have extended up to and including six months.

(Docket No. 10, pp. 124-128 of 819).

### B.    AUGUST 8, 2010 HEARING.

Acknowledging that her testimony would be consistent with the DOT and its companion publication, the SCO, VE Borgeson provided a summary of Plaintiff's past relevant work as described in DOT.  She classified Plaintiff's past relevant work going back to 1988 as dispatcher, a sedentary job, that was low-level semiskilled; and as bookkeeper, a sedentary, skilled job (Docket No. 10, pp. 70-71 of 819).  The business manager job at Staples was considered light, skilled work; the dispatcher job was considered sedentary, semiskilled work and the bookkeeping job was considered sedentary, skilled work (Docket No. 10, pp. 71-73 of 819).

### IV. MEDICAL EVIDENCE

### A.    EVIDENCE OF PHYSICAL IMPAIRMENTS ARISING PRIOR TO EXPIRATION OF DATE LAST INSURED.

On May 20, 1996, Dr. Alan J. Lerner, M. D., a neurologist, determined that Plaintiff had a long history of migraine headaches.  After reviewing the list of medications that had been unsuccessful in preventing the onset of headaches or attacking the pain arising from the headaches, Dr. Lerner prescribed Stadol® NS, a synthetically derived opoid in an aqueous solution that was delivered in a metered spray

to the nasal mucosa (Docket No. 10, p. 432 of 819; www.vitals.com/doctors/Dr_Alan_Lerner; www.drugs.com/pro/stadol.html).

On June 19, 1996, Dr. Lerner renewed the prescriptions for medications used to treat migraine symptoms.  In addition, Dr. Lerner diagnosed Plaintiff with pharyngitis and bronchitis for which he prescribed Biaxin®, a medication designed to treat and prevent bacterial infections (Docket No. 10, p. 430 of 819; PHYSICIAN'S DESK REFERENCE, 2006 WL 353450 (2006)).

On November 20, 1996, Dr. Lerner determined that Plaintiff was taking Neurontin®, an anti-seizure medication; Stadol®; Soma®, a muscle relaxant; and Ambien®, a sleep aid.  In light of the frequency of migraine headaches, Dr. Lerner increased the dosage of the Neurontin® (Docket No. 10, p. 429 of 819; PHYSICIAN'S DESK REFERENCE, 2006 WL 384572, 387951; www.nlm.nih.gov).

On February 26, 1997, Dr. Lerner discontinued the prescription for Neurontin® and renewed the prescription for Stadol® (Docket No. 10, p. 423 of 819).

Dr. Thomas Chelimsky, M. D., a neurologist, conducted an evaluation on July 9, 1997.  He diagnosed Plaintiff with a migraine with aura, a migraine that preceded or accompanied by a variety of sensory warning signs or symptoms such as flashes of light, blind spots or tingling the hand or face, tension type headache and cluster headache features.  Dr. Chelimsky prescribed Sansert®, a medication used to treat migraines, with instructions to increase the dosage after two days and to report her progress after two weeks.  During the following week, Plaintiff reported that the side effects from the Sansert® included tachycardia and chest tightness (Docket No. 10, pp. 424-428 of 819; www.nlm.nih.gov; www.vitals.com/doctors/Dr_Thomas_Chelimsky.html).

On July 10, 1998, August 17, 1998, and October 13, 1998, Dr. Lerner renewed the prescriptions for Vicodin®, a medication used for the relief of moderate to moderately severe pain, Soma® and Ambien®

8

(Docket No. 10, pp. 422, 762, 763 of 819; PHYSICIAN'S DESK REFERENCE, 2006 WL 354661 (2006)).

Dr. Lerner prescribed Maxalt-MLT, a medication used to treat migraine attacks on February 5, 1999 (Docket No. 10, p. 761 of 819; PHYSICIAN'S DESK REFERENCE, 2006 WL 377518 (2006)).

On May 7, 1999, Dr. Lerner found that Plaintiff was clinically stable with regards to her headache symptomatology. Plaintiff reported that the consumption of Depakote, a medication used to treat certain types of seizure disorders and mania, was helpful in relieving some of her symptoms. Dr. Lerner prescribed Vicodin ES®, a combination medication of narcotic pain reliever and acetaminophen, for relief of moderate to moderately severe pain (Docket No. 10, p. 418 of 819; PHYSICIAN DESK REFERENCE, 2006 WL 354667 (2006); www.nlm.nih.gov).

Plaintiff presented to the Lake Hospital System Emergency Room (LHSER) on May 20, 1999, with slurred speech and signs of depression. The attending physician diagnosed Plaintiff with situational depression. Further, the attending physician suspected that Plaintiff had misused her medications. Although there was nothing with which to compare, the electrocardiography results showed evidence of sinus tachycardia. Plaintiff's glucose levels were elevated but her urea nitrogen, creatinine and hemoglobin levels were lower than the normal range. Plaintiff's urine tested positive for the presence of tetrahydrocannabinol (THC), an active isomer present in cannabis, and opiates.[1] When medically cleared, Plaintiff was discharged in an improved condition with family members (Docket No. 10, pp. 360-368 of 819; STEDMAN'S MEDICAL DICTIONARY 405240, 404330 (27th ed. 2000)).

On July 7, 1999, Dr. Lerner continued the prescriptions of Vicodin® and Zomig®, a medication used for the acute treatment of migraine headaches. In addition, he treated Plaintiff for bronchitis and

---

[1]
    According to the examiner, the consumption of anything containing poppy seeds before a drug test can cause a drug test result which is positive for opiates.

supplemented her drug regimen with a five-day prescription for Zithromax®, a medication prescribed to treat or prevent infections suspected to be caused by bacteria (Docket No. 10, p. 417 of 819; PHYSICIAN'S DESK REFERENCE, 2006 WL 384617, 354661, 344338, 355338 (2006)).

On August 12, 1999, Plaintiff was treated at LHSER for acute asthmatic bronchitis (Docket No. 10, pp. 356-358 of 819).

On October 18, 1999, Dr. Lerner noted that Plaintiff had decreased right bicep reflex and sensation of tingling, burning, pricking or numbness in the distribution of the C7 dermatome. The prescription for Vicodin® was changed to OxyContin® an opoid used for the management of moderate to severe pain (Docket No. 10, p. 416 of 819; STEDMAN'S MEDICAL DICTIONARY, 299220 (27th ed. 2000)).        On December 20, 1999, Dr. Lerner renewed the prescriptions for Vicodin® and Ambien® and supplemented the drug therapy with Sonata®, a medication used to treat insomnia (Docket No. 10, p. 415 of 819; PHYSICIAN'S DESK REFERENCE, 2006 WL 372345 (2006)).

On March 23, 2000, Dr. Lerner changed Plaintiff's prescription for Vicodin ES® to Vicodin HP®, a medication that is more potent in treating moderately severe pain (Docket No. 10, p. 414 of 819; PHYSICIAN'S DESK REFERENCE, 2006 WL 354665 (2006).

On July 13, 2000, Dr. Lerner reviewed the laboratory results of Plaintiff's blood count and thyroid function tests. All were negative for abnormality. Dr. Lerner renewed the prescriptions for Ambien®, Valium® and Vicodin®, each with five refills (Docket No. 10, p. 413 of 819).

On October 12, 2000, Dr. Lerner ordered renewals at a different pharmacy for Zomig®, Ambien®, Valium®, Soma® and Vicodin® after the medications were stolen and refilled by an unknown friend of Plaintiff's children (Docket No. 10, p. 412 of 819).

On December 30, 2000, Plaintiff was treated at LHSER for migraine cephalgia. Medication was

10

introduced within the substance of the muscle that provided relief (Docket No. 10, pp. 351-353 of 819).

Plaintiff was treated on January 25, 2001 at LHSER for severe cephalgia that started two days prior.  A variety of medications were used to relieve pain and improve other symptoms such as photophobia and nausea (Docket No. 10, pp. 346-350 of 819).

Plaintiff presented to the University Hospitals Health System (UHHS) on January 11 and 29, 2001, complaining of chronic daily headache and/or severe migraine headaches.  On January 11, 2001, Dr. Lerner renewed the drug regimen which included Vicodin ES®, Valium®, Zomig®, Ambien® and Soma®.  On January 29, 2001, Dr. Lerner implemented a simpler drug regimen, discontinuing the Vicodin® and Ambien® and substituting Stadol nasal spray, a treatment for migraines, and Klonopin®, a medication used to control seizures and treatment for panic disorders (Docket No. 10, pp. 410, 411 of 819).

Plaintiff presented to the LHSER on April 7, 2001, in an altered mental state.  Although she was disoriented, confused, lethargic and unkempt, Plaintiff admitted to taking only two sleeping pills. Emergency room physician, Dr. Nancy Poggi, ordered an echocardiogram (ECG), the results of which were abnormal when compared with results from an ECG administered in May 1999.  However, there was no evidence of active pulmonary or pleural diseases, intercranial hemorrhage or abnormal heart sinus rhythm.  Plaintiff tested positive for the presence of THC; opiates and benzodiazepine, a synthesis of a number of psychoactive compounds.  Plaintiff's red cell distribution width exceeded the normal range as did the number of neutrophil granulocytes in her blood.  The measure of carbon dioxide partial pressure exceeded the normal range (Docket No. 10, pp. 334-344; STEDMAN'S MEDICAL DICTIONARY, 46200 (27th ed. 2000).

Plaintiff was admitted to University Hospitals of Cleveland on April 7, 2001.  Dr. Lerner

11

diagnosed Plaintiff with polysubstance drug abuse, abnormal grief reaction, myofascial pain syndrome of fibromyalgia with associated migraines, a depressive illness with psychotic features, low levels of phosphorus in the blood and low levels of magnesium in the blood.  Plaintiff was discharged on April 10, 2001, in a stable condition (Docket No. 10, pp. 293-294, 407-408 of 819).

Plaintiff underwent a psychiatric consultation on April 9, 2001, during which Plaintiff requested treatment for her addiction to medicine.  Ms. Linda Lee, a third year medical student, conducted a clinical review of Plaintiff's familial and medical histories.  Ms. Lee noted that Plaintiff's urine toxicology results were positive for benzodiazepine, cannabis and opiates (Docket No. 10, pp. 296-301 of 819).

Dr. Mary H. Rabb, D. O, a family practitioner, conducted a consultation to address "addiction medicine."  She observed that Plaintiff was depressed, with a sluggish affect but that she became more conversant as the interview progressed.  It was Dr. Rabb's opinion that Plaintiff suffered from a severe grief reaction to the death of her mother six weeks earlier for which Dr. Rabb recommended that Plaintiff undergo grief counseling and avoid use of habit forming medications (Docket No. 10, pp. 302-303 of 819; www.healthgrades.com/physician/dr-mary-rabb-xkcpm).

Plaintiff presented to Dr. Lerner on October 4, 2001, with complaints of intermittent numbness in her right arm which radiated to the fourth and fifth fingers.  She noted a substantial reduction in migraine frequency since she was weaned of opiate analgesics.  Plaintiff requested a prescription for narcotic analgesics (Docket No. 10, p. 404 of 819).

Dr. Lerner referred Plaintiff for a cervical spine magnetic resonance imaging test.  On October 17, 2001, Dr. Andrew L. Goldberg, M. D., a neuroradiologist, concluded from the magnetic resonance imaging of Plaintiff's cervical spine, that she had mild cervical spondylosis with central bulging disc at C4-5 and C5-6.  The results failed to show cord or nerve root sleeve compression (Docket No. 10, p. 735

of 819; www.vitals.com/doctors/Dr_Andrew_L_Goldberg.html).

**B.    EVIDENCE OF MENTAL IMPAIRMENTS ARISING PRIOR TO THE DATE LAST INSURED.**

In the Psychiatric Review Technique (PRT) assessment for a period of time commencing on December 31, 1999 through December 31, 2001, Dr. William Benninger, Ph. D., a psychologist, diagnosed Plaintiff with a substance addiction disorder; however, he found that was insufficient evidence to demonstrate that this disorder was at the root of her functional limitations or that she was disabled during this period of time (Docket No. 10, pp. 485-497 of 819; www.healthgrades.com/provider/william-benninger–22hvv).

Plaintiff was admitted to the Windsor Behavioral Health Network on April 10, 2001, for treatment of major depressive disorder with psychotic features, polysubstance addiction, migraine headaches and grief.  Upon admission, Dr. Toni Louise Carman, M. A., M. D., a board-certified psychiatrist, opined that Plaintiff's major problem was her chemical dependency.  In her opinion, Plaintiff's global assessment of functioning[2] score placed her in the category that denote serious symptoms or a serious impairment. By April 14, 2001, Plaintiff's mention was clearer although she continued to have a flat affect that brightened with stimulation.  There were no suicidal or homicidal ideations.  When discharged on April 16, 2001, Dr. Carmen's subjective rating of Plaintiff's social, occupational and psychological functioning remained in the serious range.  Plaintiff was still depressed but not psychotic (Docket No. 10, pp. 305-315 of 819; www.healthgrades.com/physician/dr-toni-carman-x2htj).

On May 26, 2001, Plaintiff commenced treatment with Dr. Carman.  Over the following years,

---

[2]

The global assessment of functioning is a numeric scale of 0 through 100, used by mental health clinicians and physicians to subjectively rate the social, occupational and psychological functioning of adults and how well the adults meet various problems of daily life.  Www.psyweb.com/DSM_IV/jsp/Axis_V.jsp.

13

Dr. Carman gave Plaintiff samples of Zyprexa® and Seroquel® both medications used to treat symptoms of schizophrenia and/or manic episodes.  In addition, Dr. Carman conducted sessions during which she provided therapeutic interaction or treatment.  During psychotherapy, Dr. Carmen addressed a number of stressors including Plaintiff's new marriage, the rape, limited finances and the relationship issues with her daughter (Docket No. 10, pp. 436- 447 of 819; PHYSICIAN'S DESK REFERENCE; 2006 WL 372504 (2006)).  On September 22, 2006, Dr. Carman discharged Plaintiff from psychiatric treatment after she missed two appointments during six months (Docket No. 10, p. 435 of 819).

### V.  STANDARD FOR ESTABLISHING DISABILITY

For purposes of determining eligibility for DIB under the Act, the ALJ generally only considers evidence from the alleged disability onset date through the date last insured.  *Lowery v. Astrue*, 2011 WL 7578124, \*9 fn. 8 (S. D. Ohio 2011) (*citing King v. Secretary of Health and Human Services*, 896 F. 3d 204, 205-206 (6th Cir. 1990)).  DIB is available only for those who have a "disability."  *Colvin v. Barnhart,* 475 F.3d 727, 730 (6th Cir. 2007) (*citing* 42 U.S.C. § 423(a), (d); *See also* 20 C. F. R. § 416.920).  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  *Id.* (*citing* 42 U.S.C. § 423(d)(1)(A) (definition used in the DIB context); *See also* 20 C. F. R. § 416.905(a) (same definition used in the SSI context)).

The Commissioner's regulations governing the evaluation of disability for DIB are identical for purposes of this case, and are found at 20 C. F. R. § 404.1520, and 20 C. F. R. § 416.920 respectively:

First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity"

at the time she seeks disability benefits.  *Id.* (*citing Abbott v. Sullivan,* 905 F.2d 918, 923 (6ᵗʰ Cir. 1990)).

Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  *Id.*  A "severe impairment" is one which "significantly limits  . . .  physical or mental ability to do basic work activities."  *Id.*

Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience.  *Id.*

Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled.  *Id.*

For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.  *Id.* (*citing Heston v. Commissioner of Social Security*, 245 F.3d 528, 534 (6ᵗʰ Cir. 2001)(internal citations omitted) (second alteration in original)).  If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates.  *Id.* (*citing* 20 C. F. R. § 404.1520(a)(4); 20 C. F. R. § 416.920(a)(4)).

## VI.  THE ALJ'S FINDINGS

The ALJ considered all of the medical opinions in the record regarding the severity of Plaintiff's impairment and made the following findings of fact:

1.  Plaintiff met the disability insured status requirements of the Act on December 31, 2001.  Plaintiff had not engaged in substantial gainful activity during the period from her alleged onset date of December 31, 1999 through the date last insured on December 31, 2001.

2.  Through the date last insured, Plaintiff had severe impairments consisting of headaches-both migraine and chronic daily headaches believed to be partially analgesic rebound headaches, tension headaches and cluster headaches; major depressive disorder with psychotic features; mild degenerative disc and joint disease of the cervical spine; polysubstance addiction and

15

abuse; and myofascial pain syndrome/chronic pain syndrome/fibromyalgia.

3.  Through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C. F. R. Part 404, Subpart P, Appendix 1 (20 C. F. R. §§ 404.1520(d), 404.1525 and 404.1526).

4.  Through the date last insured, Plaintiff has the residual functional capacity to perform sedentary work as defined in 20 C. F. R. § 404.1567(a), except that she could not perform highly technical or complex tasks.

5.  Through the date last insured, Plaintiff was capable of performing past relevant work as a dispatcher or receptionist.  This work did not require the performance of work-related activities precluded by Plaintiff's residual functional capacity.

6.  Plaintiff was not under a disability as defined in the Act, at any time from December 31, 1999, through December 31, 2001.

(Docket No. 10, pp. 15-24 of 819).

## VII. STANDARD OF REVIEW

The federal district court exercises jurisdiction over the final decision of the Commissioner pursuant to 42 U.S.C. § 405(g).  Title 42 U.S.C. § 405(g) permits the district court to conduct judicial review over the final decision in a civil action.  *McClanahan v. Commissioner of Social Security,* 474 F.3d 830, 832-833 (6th Cir. 2006).  Judicial review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied.  *Elam ex rel. Golay v. Commissioner of Social Security*, 348 F.3d 124, 125 (6th Cir. 2003) (*citing Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997)).

This Court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Commissioner Social Security Administration*, 402 F.3d 591, 595 (6th Cir. 2005) (*citing Warner v. Commissioner of Social Security,* 375 F.3d 387, 390 (6th Cir.2004) (*quoting Walters v. Commissioner of Social Security,* 127 F.3d 525, 528 (6th Cir. 1997)).

16

Substantial evidence is defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v. Commissioner of Social Security*, 486 F.3d 234, 241 (6th Cir. 2007).

In deciding whether to affirm the Commissioner's decision, it is not necessary that the court agree with the Commissioner's finding, as long as it is substantially supported in the record. *Id.* (*citing Her v. Commissioner of Social Security*, 203 F.3d 388, 389-90 (6th Cir. 1999)). The substantial evidence standard is met if a "reasonable mind might accept the relevant evidence as adequate to support a conclusion." *Longworth, supra,* 402 F. 3d at 595 (*citing Warner, supra*, 375 F.3d at 390) (*citing Kirk v. Secretary of Health & Human Services,* 667 F.2d 524, 535 (6th Cir. 1981) *cert. denied*, 103 S. Ct. 2478 (1983) (internal quotation marks omitted)). If substantial evidence supports the Commissioner's decision, this Court will defer to that finding "even if there is substantial evidence in the record that would have supported an opposite conclusion." *Id.* (*citing Warner,* 375 F.3d at 390) (*quoting Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997)).

## VIII. ANALYSIS

Plaintiff seeks an order remanding the case to the Commissioner for the reasons that:

(1)     The ALJ's analysis at step three of the sequential evaluation is flawed.
(2)     The ALJ failed to evaluate the medical evidence of record.
(3)     The ALJ failed to properly regard Plaintiff's poor work performance and work accommodations provided by her former employer.

Defendant contends that:

(1)     The ALJ's finding that Plaintiff did not meet or equal the listing at step three of the evaluation is supported by substantial evidence.
(2)     The ALJ reasonably concluded that Dr. Lerner's opinions were not entitled to any weight.
(3)     Substantial evidence supports the ALJ's finding that Plaintiff could not perform her past work as a dispatcher and receptionist.

17

1.

Relying on this Court's own *May v. Commissioner,* 2011 WL 3490186 (N. D. Ohio 2011), Plaintiff's first claim asserts that the ALJ committed reversible error by skipping the step three analysis with regard to Plaintiff's physical impairments--headaches, mild degenerative disc and joint disease of cervical spine and myofascial pain syndrome/chronic pain syndrome/fibromyalgia–and determining whether they met or equaled the Listing.

At step three of the disability evaluation process, the Commissioner must consider whether a claimant's impairments meets or equals any of the relevant listing requirements of 20 C.F.R. Part 404, Subpart P, Appendix 1. 20 C. F. R.  §§ 404.1520(a), 416.920(a).  *Vasquez v. Commissioner of Social Sec*urity, 2012 WL 314250, *4 (N. D. Ohio 2012).  An impairment that meets only some of the medical criteria and not all does not qualify, despite its severity. *Id.* (*citing Sullivan v. Zebley*, 110 S. Ct. 885, 891 (1990)).  Conversely, a claimant who meets the requirements of a listed impairment will be deemed conclusively disabled, and entitled to benefits. *May v. Astrue*, 2011 WL 3490186, *7 (N. D. Ohio 2011).

An impairment or combination of impairments is considered medically equivalent to a listed impairment " . . .  if the symptoms, signs and laboratory findings as shown in medical evidence are at least equal in severity and duration to the listed impairments." *Vasquez, supra*, at *4 (*citing Land v. Secretary of Health and Human Services*, 814 F.2d 241, 245 (6th Cir. 1986) ( per curiam )).  In order to show that an unlisted impairment or combination of impairments is medically equivalent to a listed impairment, the claimant "must present medical findings equal in severity to all the criteria for the one most similar listed impairment." *Id.* (*citing Sullivan*, 110 S. Ct. at 891).

The burden is on the plaintiff to present evidence establishing that he or she has a listing level impairment. *Id.* (*see Jones v. Commissioner of Social Security*, 336 F.3d 469, 474 (6th Cir. 2003)).  In

18

order to conduct a meaningful review, the ALJ's written decision must make sufficiently clear the reasons for his decision.  *May, supra,* at * 7.

Here, the ALJ found physical and mental impairments at step two:  headaches-both migraine and chronic daily headaches believed to be partially analgesic rebound headaches, tension headaches and cluster headaches; mild degenerative disc and joint disease of the cervical spine; and myofascial pain syndrome/chronic pain syndrome/fibromyalgia.  She then went on to step three to determine whether Plaintiff had an impairment or combination of impairments that met or medically equaled one of those listed.  At step four, the ALJ determined that " no treating or examining physician has indicated findings that would satisfy the severity of any listed impairments.  In reaching the conclusion that the claimant did not have an impairment or combination of impairments that meet or medically equal a listed impairment."  The Magistrate acknowledges that migraine headaches, tension headaches or cluster headaches are largely subjective complaints of head pain that can generally be proven through clinical findings of migraine symptoms.  Plaintiff has demonstrated that she has headaches that are severe.  The ALJ found that she has headaches that are severe.  However, Plaintiff has not demonstrated that migraine headaches were found in any of the Listing components.  Neither has the Magistrate found migraine headaches among the listed impairments.  The ALJ did not fail to apply the correct legal standards by engaging in a detailed explanation of how he did not find migraine headaches, tension headaches or cluster headaches in the Listing.

As for mild degenerative disc and joint disease of the cervical spine, the Magistrate notes that Plaintiff did not aggressively seek treatment for mild degenerative disc and joint disease of the cervical spine prior to the expiration of the insured status.  The treatment notes fail to report any observations of significant signs, symptoms or deficits in Plaintiff's neck, back or extremities resulting therefrom.

19

Nevertheless, to meet the Listing, degenerative disc disease must be of the severity to compromise the nerve root (including the cauda equina) or the spinal cord, with evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine); or spinal arachnoiditis, confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia, resulting in the need for changes in position or posture more than once every two hours; or lumbar spinal stenosis resulting in pseudoclaudication, established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain and weakness, and resulting in inability to ambulate effectively, as defined in 1.00B2b.

Although Plaintiff's cervical spine showed mild cervical spondylosis with central bulging disc at C4-5 and C5-6, the relevant medically determinable evidence showed specifically that Plaintiff's condition did not show evidence of cord or nerve root sleeve compression (Docket No. 10, p. 735 of 819). There was no need to engage in a detailed explanation of how the ALJ compared the evidence of degenerative disc and joint disease of the cervical spine with the lack of requisite neurological defects and then determined that this impairment did not meet the severity of the Listing.

During the April 2001 hospitalization, Dr. Lerner diagnosed Plaintiff with myofascial pain syndrome/chronic pain syndrome/fibromyalgia.  Plaintiff has not shown that this impairment can be found in the Listing.  There was no need to engage in a detailed explanation of how the ALJ compared the single reference to myofascial pain syndrome/chronic pain syndrome/fibromyalgia during the relevant period and then concluded that this impairment was not of the severity to meet the Listing.

20

The ALJ followed the rules by considering the medical criteria, determining that Plaintiff's impairments were neither listed as an impairment nor medically equivalent in severity to all of the criteria for any of the most similar listed impairment.  The ALJ did not err by failing to discuss in detail how such impairments failed to meet the Listing.  Accordingly, the Magistrate recommends that the Court deny Plaintiff's first claim.

**2.**

Plaintiff argues that the ALJ erred in failing to attribute controlling weight to Dr. Lerner's opinions.  In the alternative, the ALJ failed to evaluate Dr. Lerner's opinions consistent with the requirements of 20 C. F. R. § 404.1527 and SSR 96-2p, POLICY INTERPRETATION RULING TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, 1996 WL 374188 (1996).

Under 20 C. F. R. § 404.1527(c) (2), every medical opinion received is evaluated.  Unless a treating source's opinion is given controlling weight under paragraph (c)(2) of this section, the following factors should be considered in deciding the weight to give to any medical opinion.

(2) Treatment relationship.  Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.  If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in your case record, we will give it controlling weight.  When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (c)(2)(i) and (c)(2)(ii) of this section, as well as the factors in paragraphs (c)(3) through (c)(6) of this section in determining the weight to give the opinion.  We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) Length of the treatment relationship and the frequency of examination.  Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion.  When the treating source has seen you a number of times and long enough to have obtained a longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a nontreating source.

21

(ii) Nature and extent of the treatment relationship.  Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion.  We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.  For example, if your ophthalmologist notices that you have complained of neck pain during your eye examinations, we will consider his or her opinion with respect to your neck pain, but we will give it less weight than that of another physician who has treated you for the neck pain.  When the treating source has reasonable knowledge of your impairment(s), we will give the source's opinion more weight than we would give it if it were from a nontreating source.

(3) Supportability.  The more a medical source presents relevant evidence to support an opinion, particularly medical signs and laboratory findings, the more weight we will give that opinion.  The better an explanation a source provides for an opinion, the more weight we will give that opinion.  Furthermore, because nonexamining sources have no examining or treating relationship with you, the weight we will give their opinions will depend on the degree to which they provide supporting explanations for their opinions.  We will evaluate the degree to which these opinions consider all of the pertinent evidence in your claim, including opinions of treating and other examining sources.

(4) Consistency. Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

(5) Specialization. We generally give more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist.

(6) Other factors.  When we consider how much weight to give to a medical opinion, we will also consider any factors you or others bring to our attention, or of which we are aware, which tend to support or contradict the opinion.  For example, the amount of understanding of our disability programs and their evidentiary requirements that an acceptable medical source has, regardless of the source of that understanding, and the extent to which an acceptable medical source is familiar with the other information in your case record are relevant factors that we will consider in deciding the weight to give to a medical opinion.

20 C. F. R. § 404. 1527(c)(2), (3), (4), (5) (Thomson Reuters 2012).

Paragraph (d)(2) of 20 C. F. R. § 404.1527 requires that the adjudicator will always give good reasons in the notice of the determination or decision for the weight given to a treating source's medical opinion(s), i.e., an opinion(s) on the nature and severity of an individual's impairment(s).  POLICY INTERPRETATION RULING TITLES II AND XVI: GIVING CONTROLLING WEIGHT TO TREATING SOURCE MEDICAL OPINIONS, 1996 WL 374188, at *5.  Therefore:

When the determination or decision:
* is not fully favorable, e.g., is a denial; or
* is fully favorable based in part on a treating source's medical opinion, e.g., when the adjudicator adopts a treating source's opinion about the individual's remaining ability to function; the notice of the determination or decision must contain specific reasons for the weight given to the treating source's

22

medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.  *Id.*

When the determination or decision is fully favorable and would be even without consideration of a treating source's medical opinion, the notice of the determination or decision must contain an explanation of the weight given to the treating source's medical opinion.  *Id.*  This explanation may be brief.  *Id.*

Initially, the ALJ determined that although Dr. Lerner was a treating neurologist, his opinions were not supported by detailed clinical or diagnostic test evidence.  Accordingly, Dr. Lerner's opinions did not warrant controlling weight.  The ALJ then conducted an analysis of his treatment notes pursuant 20 C. F. R. §§ 404. 1527(c)(2), (3), (4), (5) and SSR 96-2p (Docket No. 10, p. 19 of 819).

First, the ALJ considered the nature, extent and length of Plaintiff's relationship with the specialist, Dr. Lerner.  The ALJ noted that the relationship between Dr. Lerner and Plaintiff existed from 1996 through December 31, 2001, when Plaintiff's insured status expired (Docket No. 10, pp. 20-21 of 819).

Second, the ALJ reviewed the record and found that minimal weight was given to Dr. Lerner's opinions because there were few medical signs and laboratory findings to support a finding that Plaintiff suffered severe migraines prior to the date last insured.  Thus, there was no supportability for Dr. Lerner's conclusions that the migraines were severe (Docket No. 10, p. 22 of 819).

Third, the ALJ found that Dr. Lerner referred Plaintiff for a magnetic resonance imaging examination, the results of which showed mild cervical spondylosis and central bulging discs at C4-5 and C5-6.  Dr. Lerner did not correlate this evidence to the migraines or the symptoms of migraines.  His treatment was predicated solely on Plaintiff's subjective complaints of severe headaches made in the initial evaluation in 1996 (Docket No. 10, p. 22 of 819).

It is clear that the ALJ considered Dr. Lerner a treating source, whose opinions were unworthy

23

of controlling weight for the reasons that they were unsupported by medical evidence and inconsistent with other medical evidence.  The ALJ made findings consistent with the relevant case record established prior to the expiration of Plaintiff's insured status.  Therefore, the Magistrate recommends that the Court deny Plaintiff's second claim as the ALJ applied the correct legal standards and made findings of fact supported by substantial evidence in the record.

**3.**

Plaintiff claims that even though her employers made accommodations, her work performance was poor.  The ALJ should have considered poor performance and the accommodations made by her employers in assessing whether she could perform substantial gainful activity.

Substantial gainful activity means work that involves doing significant and productive physical or mental duties and is done for pay or profit.  20 C. F. R. § 404.1510 (Thomson Reuters 2012).  "We consider how well you do your work when we determine whether or not you are doing substantial gainful activity.  If you do your work satisfactorily, this may show that you are working at the substantial gainful activity level.  If you are unable, because of your impairments, to do ordinary or simple tasks satisfactorily without more supervision or assistance than is usually given other people doing similar work, this may show that you are not working at the substantial gainful activity level. . . . "  20 C. F. R. § 404.1573(b) Thomson Reuters 2012.

"The work you are doing may be done under special conditions that take into account your impairment  . . .  If your work is done under special conditions, we may find that it does not show that you have the ability to do substantial gainful activity.  Also, if you are forced to stop or reduce your work because of the removal of special conditions that were related to your impairment and essential to your work, we may find that your work does not show that you are able to do substantial gainful activity.

24

Examples of the special conditions that may relate to your impairment include, but are not limited to, situations in which-

> (1) You required and received special assistance from other employees in performing your work;
> (2) You were allowed to work irregular hours or take frequent rest periods;
> (3) You were provided with special equipment or were assigned work especially suited to your impairment;
> (4) You were able to work only because of specially arranged circumstances, for example, other persons helped you prepare for or get to and from your work; ...
> (6) You were given the opportunity to work despite your impairment because of family relationship, past association with your employer, or your employer's concern for your welfare."

20 C. F. R. § 404.1573(c) (Thomson Reuters 2012).

The ALJ did not specifically reference 20 C. F. R. § 404.1573 in her discussion.  However, the ALJ relied on Plaintiff's testimony that early in her career she was a dispatcher.  Her employer made special accommodations including the ability to work in sunglasses, lower the lights, regurgitate when nauseous and miss work when necessary and Dr. Lerner's opinion that Plaintiff was unable to tolerate stress and she would have to incur multiple unexcused absences during a month (Docket No. 10, pp. 20, 22 of 819).  Plaintiff did not claim that she worked irregular hours, was provided special equipment, was able to work only because of specially arranged circumstances.  The ALJ concluded that the work done under these specially arranged conditions tended to show that prior to the expiration of her insured status, Plaintiff had the ability to work at the substantial gainful activity level.

Since the ALJ followed the procedure, the Magistrate recommends that the Court deny Plaintiff's third claim.

### IX.  CONCLUSION

For these reasons, the Magistrate recommends that the Court affirm the Commissioner's decision and terminate the referral to the undersigned Magistrate.

25

<u>/s/Vernelis K. Armstrong</u>
United States Magistrate Judge

Date:   May 30, 2012

## X.  NOTICE

Please take notice that as of this date the Magistrate's report and recommendation attached hereto has been filed.  Pursuant to Rule 72.3(b) of the LOCAL RULES FOR NORTHERN DISTRICT OF OHIO, any party may object to the report and recommendations within fourteen (14) days after being served with a copy thereof.  Failure to file a timely objection within the fourteen-day period shall constitute a waiver of subsequent review, absent a showing of good cause for such failure.  The objecting party shall file the written objections with the Clerk of Court, and serve on the Magistrate Judge and all parties, which shall specifically identify the portions of the proposed findings, recommendations, or report to which objection is made and the basis for such objections.  Any party may respond to another party's objections within fourteen days after being served with a copy thereof.

Please be further advised that the Sixth Circuit Court of Appeals, in *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981) held that failure to file a timely objection to a Magistrate's Report and Recommendation foreclosed appeal to the Court of Appeals.  In *Thomas v. Arn*, 106 S. Ct. 466 (1985), the Supreme Court upheld that authority of the Court of Appeals to condition the right of appeal on the filing of timely objections to a Report and Recommendation.